UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
TINA ZWIEBEL,

                 Plaintiff,

                                    <u>MEMORANDUM & ORDER</u>
     -against-                    19-CV-1651 (JS)

ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,[1]

                 Defendant.
------------------------------------X
APPEARANCES
For Plaintiff:       Daniel A. Osborn, Esq.
                   Osborn Law, P.C.
                   43 West 43rd Street, Suite 131
                   New York, New York 10036

For Defendant:       Matthew J. Modafferi, Esq.
                   United States Attorney's Office
                   Eastern District of New York
                   271A Cadman Plaza East
                   Brooklyn, New York 11201

SEYBERT, District Judge:

      Tina Zwiebel ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) and/or Section 1631(c)(3), 42 U.S.C. § 1383(c)(3), challenging the denial of her applications for Social Security Disability Insurance Benefits and Supplemental Security Income by the Commissioner of Social Security (the "Commissioner"). (Compl., D.E. 1, ¶¶ 1, 7.) Pending before the Court are the parties' cross-

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party.

motions for judgment on the pleadings.  (Pl. Mot., D.E. 16; Comm'r Mot., D.E. 17.)  For the following reasons, Plaintiff's motion is DENIED and the Commissioner's motion is GRANTED.

<u>BACKGROUND</u>[2]

I.   <u>Procedural History</u>

On June 21, 2016, Plaintiff filed for disability insurance benefits, alleging that, since May 28, 2016, multiple sclerosis and hemiparesis have rendered her disabled.  On July 25, 2016, she also filed an application for supplemental security income.  Both applications were denied on September 28, 2016, and on October 5, 2016, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (R. 13.)  On August 2, 2018, Plaintiff appeared with her attorney by video teleconference for a hearing, during which a vocational expert testified.  (R. 13; 38-71.)  In a decision dated October 29, 2018, the ALJ found that Plaintiff was not disabled from her alleged onset date of May 28, 2016, through the date of the decision.  (R. 13-33.)  On January 25, 2019, the Social Security Administration's Appeals Council denied Plaintiff's request for review and the ALJ's

---

[2] The background is derived from the administrative record ("R.") filed by the Commissioner on August 19, 2019.  (R. pp. 1-486, D.E. 14; pp. 487-986, D.E. 14-1; pp. 987-1275, D.E. 14-2.)  For purposes of this Memorandum and Order, familiarity with the administrative record is presumed.  The Court's discussion is limited to the challenges and responses raised in the parties' briefs.

decision became the final decision of the Commissioner.  (R. 1-6; 176-178.)

Plaintiff timely filed this action on March 22, 2019 and moved for judgment on the pleadings on December 18, 2019.  (See Pl. Br., D.E. 16-1.)  On February 18, 2020, the Commissioner opposed Plaintiff's motion and cross-moved for judgment on the pleadings.  (See Comm'r Br., D.E. 18.)  On April 17, 2020, Plaintiff opposed the Commissioner's motion and replied in further support of her motion.  (See Pl. Reply, D.E. 21.)

II.  Evidence Presented to the ALJ

A. Testimonial Evidence and Employment History

At the time of the August 2, 2018 hearing, Plaintiff was 31 years old, five feet tall, and weighed 260 pounds.  (R. 45.) Plaintiff testified that she had completed twelfth grade as well as "a little over a year at Suffolk Community College."  (R. 45.) According to Plaintiff, she lives alone with her twenty-month old daughter.  (R. 44.)  For the two years prior to her last day worked on May 27, 2016,[3] Plaintiff had been working as an assistant supervisor for a group home caring for mentally challenged adult women.  (R. 45.)  She further testified that for the six years

---

[3] Although Plaintiff testified that her last day worked was in 2015, the record clearly establishes that it was in 2016.  (R. 49; Pl. Br. at 6 and generally.)  Plaintiff testified that she woke up on May 28, 2016 with paralysis on her left side. (R. 49.)

prior to that job, she worked at a different center "doing the same thing" (R. 45), and that she had worked as a cashier at King Kullen in 2005 and 2007.  (R. 47.)

As to her physical health, Plaintiff testified that she has multiple sclerosis and is unable to work full-time because she "suffer[s] from extreme fatigue" and is "dealing with depression and anxiety related to the MS."  (R. 47.)  Plaintiff described that all of her physical problems are on her left side with the exception of back pain that is down the middle of her spine, up to her neck.  (R. 51.)  Plaintiff testified that her dominate side is left, and that she is left-handed.  (R. 53.)  According to Plaintiff, she has "to wear a brace on my left leg to help with my foot drop" and explained that her "left foot and right side will go numb and I have no control of stopping if I fall or if I drop things."  (R. 47-48.)  She stated that the brace is called an "AFO" (ankle foot orthosis), goes on her left foot, and slides into her shoe to help with the foot drop.  (R. 61-62.)  According to Plaintiff, the AFO helps her lift her foot to help prevent her from tripping.  (R. 61-62.)  Plaintiff also testified that she does not "have the strength to lift much" and that she "can't properly write things and even if I try and type it takes me a very long time because my left hand doesn't have full motion to use at all on a keyboard."  (R. 48.)  When she does type on a computer, Plaintiff testified that she is "very slow" because "I

4

have to use one finger." (R. 53.) According to Plaintiff, her left leg, foot, and hand spasm and become numb, causing her pain. (R. 51-52.) Because of these conditions, Plaintiff testified that she cannot stand for more than thirty minutes at a time and, when sitting "for long periods of time", she gets a "jerking movement on the left side" and feels "pain in the knee down to the foot." (R. 52.)

In addition, Plaintiff described that she suffers from "severe migraines" as well as "extreme pain from the time I get up until the time I go to bed." (R. 48.) Further, Plaintiff testified that she "chronically" gets sick because her "immune system is very weak." (R. 48.) She described often getting some type of infection, such as bronchitis, upper respiratory infections, or staph infections. (R. 48.) According to Plaintiff, it takes about five days for her to "start feeling a little bit better." (R. 48.) Plaintiff also described that her left hand sometimes goes numb or that her left hand "will clench and [she] can't open it for about 15, 20 minutes." (R. 48.) In addition, Plaintiff described "some memory issues" and testified that she "can't remember some things. Like sometimes I can do really good and then sometimes I just don't know." (R. 48-49.) More specifically, Plaintiff described having "trouble [. . .] remembering dates, sometimes remembering times. I have to put everything in a specific calendar of what I have to complete because if I have to

do something throughout the day and if it's not written down I will forget, especially doctors' appointments." (R. 50.)

Plaintiff also described that she is affected by temperature. For example, Plaintiff explained "[i]f I go out and it's hot out my body completely shuts down. I can't think. My left side is numb and I start to stutter. The cold brings on severe pain with muscle spasms and weakness as well as shooting sharp pains in the left side." (R. 49.)

Plaintiff testified that she suffers from depression and anxiety and has been treated by a neurologist and therapist for these conditions since September 2017. (R. 57-58.) According to Plaintiff, she has "panic attacks when I try and leave the house." (R. 56.) For example, if Plaintiff has to go to "a family function" or "to the store", she described going into "panic mode" and worrying about falling down and being ridiculed by others. (R. 56.) She also described not wanting to leave the house at all on some days and that "the only reason why I get out of bed everyday is because of my daughter." (R. 56.) Plaintiff's neurologist prescribed antidepressants. (R. 58.)

With regard to self-care and daily activities, Plaintiff cares for herself and her daughter but described needing assistance with self-care "[w]hen I do get sick" and explained that her sister will come over and help her get dressed. (R. 55.) She also testified that her sister will do the "big shopping" for her but

if it is "like going to the store to get the milk and bread, I can
do that."  (R. 55.)

   B. Vocational Expert's ("VE") Testimony

        A VE testified as to Plaintiff's past work history.  (R.
58-70.)  She testified that Plaintiff's work as a resident advisor
in a group home, DOT number 187.167-186, is sedentary and skilled
with an SVP (Specific Vocational Preparation) of 6, but the way
Plaintiff testified about her performance of her job duties, the
VE opined it would be at the "light exertional level."  (R. 62.)
The VE also testified that Plaintiff's job as a recreation worker,
DOT number 076.124-014, is light, skilled work with an SVP of 6.
(R. 62.)  Next, the VE testified that Plaintiff's job as a resident
care aide, DOT number 355.377-018, is medium-skilled work with an
SVP of 6.  (R. 62-63.)  Finally, the VE testified that Plaintiff's
job as a cashier/checker, DOT 211.462-014, is light and semi-
skilled work with an SVP of 3.  (R. 63.)

        The VE then testified that, although a hypothetical
person with claimant's same age, education, work experience and
residual functional capacity would not be able to perform any of
her past relevant work, there are other jobs in the national
economy that such a person could perform.  (R. 65-66.)  According
to the VE, examples of jobs that could be performed at the
sedentary exertional level are: (1) dowel inspector, DOT number
669.687-014; (2) eyeglass springs polisher, DOT number 713.684-

7

038; and (3) final assembler in the optical industry, DOT number 713.687-018.  (R. 66.)  Each of these jobs is sedentary unskilled work with an SVP of 2 and there are approximately 8,500, 6,700, and 16,600 such positions, respectively, in the national economy. (R. 66.)  The VE further testified that no jobs would be available for a hypothetical person with the same age, education, work experience and residual functional capacity as Plaintiff but who did not have "good use of both hands" because, "if you can only use the dominant hand for occasional handling, I think that it would preclude work."  (R. 67.)  Moreover, the VE testified that there would be no jobs available in the national economy for a hypothetical individual with the same age, education, work experience and residual functional capacity as Plaintiff but who would be off task 20% of the day and absent from work for two or more days per month.  (R. 68.)

    C. Medical Evidence

       In addition to the testimony from Plaintiff and the VE, the ALJ also reviewed Plaintiff's medical records.  Plaintiff received her medical treatment and diagnoses as relevant to this matter from: (1) Malcolm Gottesman, M.D., a neurologist with the Winthrop Comprehensive Sclerosis Care Center; (2) Andrea Pollack, D.O., consultative examiner; (3) Patricia Coyle, M.D., neurologist; (4) Patricia Melville, N.P., a neurological specialist in Dr. Coyle's practice; (5) several doctors at Mather

Primary Care, including Zhongju Lu, M.D. and Erika Kalabacas, D.O., primary care providers; and (6) Katherine Lizama, LMSW.  Plaintiff was also admitted to Good Samaritan Hospital and St. Charles Hospital during the relevant time period and those records were also before the ALJ.

On May 29, 2016, Plaintiff was admitted to Good Samaritan Hospital after presenting with left side weakness, slurred speech, face asymmetry (left side facial droop); possible cerebrovascular accident, possible multiple sclerosis, obesity, and pregnancy (R. 271, 294.)  A magnetic resonance imaging ("MRI") scan of Plaintiff's brain taken on that date demonstrated lesions on her left lobe and "signal abnormality.  Given the multiplicity of these lesions as well as associated flair signal abnormality active demyelinating disease (i.e. multiple sclerosis) is considered however infarction cannot be excluded."  (R. 281, 369.)  On June 1, 2016, a computer tomography ("CT") scan of Plaintiff's brain showed an area of diminished attenuation, right frontal lobe, similar to the May 29, 2016 study, representing active demyelinating disease or infarction.  (R. 364.)  On June 3, 2016, Plaintiff reported improvement.  (R. 362.)

On June 6, 2016, Plaintiff's diagnosis included possible multiple sclerosis, and she had 3/5 strength in the left upper extremity and 4/5 strength in the left lower extremity, no sensory deficits, and ambulated without assistance.  (R. 295.)  Also on

9

June 6, 2016, Plaintiff was discharged from Good Samaritan Hospital to St. Charles Hospital for inpatient rehabilitation including physical, occupational, and speech therapy.  (R. 488-581.)  On June 8, 2016, Plaintiff was alert and fully oriented, but she had left-sided facial droop, 4+/5 strength in the right upper and lower extremities, 0/5 strength in the left upper and lower extremities, and no reflexes on the left side.  (R. 493.)  An MRI of the brain showed lesions in the front lobe, left parietal lobe, and bilateral occipital lobes, with a "likely" diagnosis of multiple sclerosis. (R. 490-91.)  On June 12, 2016, "slow improvement" was noted and Plaintiff's speech was clear, and she had no sensory problems or pain.  (R. 525.)  On June 21, 2016, the speech therapist reported that Plaintiff's cognitive and communication skills were within functional limits and that speech therapy was no longer needed. (R. 570.)  On July 21, 2016, the occupational therapist reported that Plaintiff was fully oriented and had a good attention span, normal memory, intact insight, and her overall cognitive status was within functional limits.  (R. 567.)

Plaintiff was discharged from St. Charles Hospital's Rehabilitation Unit on July 22, 2016.  (R. 551, 563-65.)  At the time of her discharge, Plaintiff's gross motor coordination of her left upper extremity was minimally impaired, and her left upper extremity strength was at 3+/5.  (R. 564.)  Her upper extremity muscle tone was "normal" and her bilateral sensation was within

functional limits.   (R. 564.)   However, Plaintiff's left upper extremity gross and fine motor coordination were not within functional limits.   (R. 564.)   Plaintiff's lower left extremity function included "good" knee control and "fair" ankle and hip control, for which Plaintiff was provided an AFO (ankle foot orthosis), as well as a cane and wheelchair for ambulation.   (R. 551.)   Because Plaintiff needed an assistive device for standing, and required supervision with bathing, a wheelchair and shower chair were ordered at discharge.   (R. 565.)   Plaintiff's overall cognitive and perceptual status were "normal", and she had a "good" attention span, was cooperative, had an intact memory, and followed verbal directions as well as demonstrated directions.   (R. 564.)

Once home, Plaintiff continued with physical therapy until July 26, 2016 when her physical therapist discharged her, finding that her balance, whether sitting or standing, was "good", that her lower left extremity knee control was "good" and her left ankle and hip control were "fair."   (R. 550-51.)   The physical therapist noted that Plaintiff could walk 150 feet and could manage twelve stairs.   (R. 551.)

On August 10, 2016, Plaintiff first consulted with Dr. Gottesman at the Winthrop Comprehensive Multiple Sclerosis Care Center.   (R. 584-85.)   Plaintiff reported making "a slow gradual recovery" since being diagnosed with multiple sclerosis on May 29, 2016.   (R. 584.)   However, Plaintiff complained of "left-sided

weakness" and "frequent itching." (R. 584.) Plaintiff also reported sensitivity to heat, but she attributed it to her pregnancy. (R. 584.) Upon examination, Plaintiff was "alert," "pleasant," and able to report her history "in a clear, coherent manner." (R. 585.) Plaintiff had 4/5 left hand drift, 4/5 strength in the left upper extremity, and left upper extremity dysmetria. (Id.) Plaintiff's sensation to sharp, temperature, and vibration was "normal." (Id.) Dr. Gottesman noted Plaintiff's use of a left AFO and that her gait is "somewhat unsteady." (Id.) He noted some limitations in Plaintiff's treatment options due to her pregnancy, e.g., indicating that Neurontin would be helpful for Plaintiff's itching but reluctance in prescribing same during pregnancy. He renewed Plaintiff's prescription for Thiamine that had been given to her at the hospital. (Id.)

On August 30, 2016, Plaintiff presented to Dr. Andrea Pollack for a consultative neurological examination having been referred by the Division of Disability Determination. (R. 593-96.) Plaintiff: reported that she was twenty-four weeks pregnant; complained of left-side weakness and spasms that were worse with heat; reported imbalance and itchiness; and, was wearing a brace on her left leg due to a drop foot. (R. 593.) Plaintiff further reported that: she lives alone; cooks five times per week; cleans and shops once per week; cares for her personal needs, including

showering and dressing; and, that she watches television and socializes with friends.  (R. 593-94.)

On examination, at five feet tall and a weight of 264, Dr. Pollack opined that Plaintiff was obese but in "no acute distress" and her speech is "normal."  (R. 594.)  Dr. Pollack's other clinical findings included that Plaintiff presented with: a limping gait; the inability to heel-toe walk; and unbalanced tandem walk, but that she required no assistive devices.  (R. 594.)  The doctor also noted Plaintiff's: decreased lumbar spine range of motion; slight dysmetria of the left lower extremity; decreased deep tendon reflexes of 1+; and, left drop foot.  (R. 594-95.) Plaintiff had intact hand and finger dexterity, full grip strength bilaterally, and no muscle atrophy in her upper and lower extremities.  (Id.)  Plaintiff did not need help changing for the examination and was able to rise from a chair without difficulty.  (R. 594.)  She was fully oriented, had an intact memory, and appropriate mood, insight, and judgment.  (R. 594.) Plaintiff also had normal lower extremity sensation to pain, light touch, proprioception, and vibration.  (R. 595.)

Based on her observations and evaluation, Dr. Pollack opined that Plaintiff has a "stable" prognosis notwithstanding her pregnancy and multiple sclerosis.  (R. 595.)  Dr. Pollack indicated "moderate restriction in walking, standing, and climbing stairs", "mild restriction in bending, lifting, and carrying", and opined

13

that Plaintiff "should avoid heights, operating heavy machinery, and activities which may require heavy exertion or may put her at risk for fall." (R. 595.)

Plaintiff continued outpatient physical and occupational therapy for Multiple Sclerosis at St. Charles Rehabilitation from August 2016 through October 2016. (R. 599-831.) On August 5, 2016, Plaintiff required no devices for ambulation but wore her left AFO. (R. 605.) She also reported no difficulty: driving; keeping a checkbook; handling personal finances or shopping; with her memory; remaining attentive or focused during activities or conversation; and, getting along with friends or family members. (R. 610.) However, Plaintiff indicated that she had quite a bit of difficulty moving around independently in the community, with or without assistive devices, and managing fatigue. (R. 610.) On August 23, 2016, Plaintiff reported that she was independent in feeding, caring for her personal needs, and driving. (R. 645.)

On September 6, 2016, Plaintiff was able to ambulate two laps without her left AFO and reported a pain level of 1/10 on the pain scale after therapy. (R. 670, 787.) On September 16, 2016, at twenty-seven weeks pregnant and after falling off a chair and visiting the emergency room, Plaintiff was again admitted to Good Samaritan Hospital with complaints of back and buttocks pain. (R. 1164.) She was alert and fully oriented although she was crying. (Id.) Upon examination, it was noted that Plaintiff was wearing

14

a brace on her left ankle, and that her gait was steady, she was able to sit comfortably, had full strength (5/5) in the lower extremities, ambulated without difficulty, and had full range of motion and strength throughout the extremities.  (R. 1167-68.) Plaintiff was discharged on September 17, 2016 where it was also noted that she was independent in all activities of daily living, including dressing, grooming, feeding, bathing, toileting, getting in and out of bed, and walking in her home.  (R. 1187, 1204.)  The discharge notes also reflect that Plaintiff reported that, in the past seven days, she had not been anxious or worried for no good reason, nor had she had difficulty sleeping or felt sad, scared or panicky for no good reason.  (R. 1200.)

    On September 27, 2016, Plaintiff continued outpatient physical and occupational therapy for Multiple Sclerosis at St. Charles Rehabilitation and complained of back pain at level of 4/10 on the pain scale, reporting that a heating pad helped her "slightly."  (R. 699.)  Treatment notes reflect that Plaintiff was able to complete therapy "without difficulty" and was able to ambulate two laps without her AFO also "without difficulty."  (R. 699, 816.)  Plaintiff was given a HEP (home exercise program) for ankle stability and her post-treatment pain level was 1/10 on the pain scale.  (R. 699, 816.)  On October 28, 2016, Plaintiff complained of pain at 6/10 on the pain scale and reported having "a busy month preparing for [her] baby" (R. 706, 823), and worked

15

on bilateral hand exercises with "fair endurance." (R. 707, 824.) Plaintiff tolerated treatment "well" although the therapist's notes also reflect that the Plaintiff complained of increased pain and tingling in the left hand although post-treatment pain was recorded as 0/10 on the pain scale. (R. 707, 824.)

Plaintiff also continued treatment with Dr. Gottesman. Treatment notes from October 26, 2016 reflect that he observed that Plaintiff was ambulating using a left AFO and was making a "slow gradual recovery." (R. 833.) He noted that Plaintiff was alert, had normal memory, clear speech, symmetrical facial strength, and was neurologically intact. (R. 834.) Plaintiff had 4/5 strength in the right bicep and normal strength in the left bicep. (R. 834.) She had normal sensation throughout the extremities. (R. 834.) The doctor prescribed Neurontin as her obstetrician had approved its use. (R. 835.)

On November 28, 2016, Plaintiff presented to Dr. Gottesman with complaints of headaches and asked that he increase her Neurontin dose, which he did. (R. 836.) Plaintiff also reported muscle twitching and cramping in her left hand. (Id.) Dr. Gottesman noted that Plaintiff was alert, had normal memory, clear speech, symmetrical facial strength, and was neurologically intact. (R. 837.) Plaintiff had 4/5 strength in the left bicep. (Id.) She had normal sensation throughout the extremities but had a tendency to drop her left foot without her AFO. (R. 836-38.)

16

Dr. Gottesman increased her Neurontin dosage from 300 mg to 600 mg/day and determined that Plaintiff should begin Tysabri[4] infusions but before such treatment began, Plaintiff delivered her daughter by cesarean section in December 2016.  (R. 836, 838-39.)

An MRI of Plaintiff's brain on January 21, 2017 showed brain abnormalities consistent with multiple sclerosis.  (R. 847-48.)   The MRI also showed that a previously restricted diffusion in the large right centrum semiovale lesion had completely or almost completely resolved and the right centrum semiovale lesion extends further inferiorly compared to the May 29, 2016 study into the posterior limb of internal capsule and brainstem.  (R. 848.)

Plaintiff next saw Dr. Gottesman on January 31, 2017.  (R. 839.)  Plaintiff brought her newborn baby to the appointment and complained of diffuse body pain, involuntary clenching of the left hand, and worsening left arm and left leg pain.  (Id.)  Dr. Gottesman noted that Plaintiff was alert, had normal memory, had symmetrical facial strength, and no psychiatric related symptoms.  (Id.)  He noted that Plaintiff had "slightly diminished" left hand grip and a tendency to left-foot drop.  (R. 840.)  He continued her prescription for Neurontin, which Plaintiff reported relieved

---

[4] Tysabri is a prescription medicine used to treat relapsing forms of multiple sclerosis.  See https://www.tysabri.com/ en_us/home/about/taking-tysabri.html.

her headaches, and also prescribed Baclofen and Duloxetine. (R. 839.)

Plaintiff underwent three Tysabri infusions between her January 31, 2017 appointment and her next follow-up appointment with Dr. Gottesman on May 2, 2017. (R. 842.) The infusions were well-tolerated and Plaintiff reported that "[s]he feels she has improved with this medication." (R. 843.) Plaintiff reported a six-week history of lower back pain radiating down the left lower extremity and complained of involuntary clenching of the left hand. (R. 842.) While Dr. Gottesman noted Plaintiff was wearing her left AFO, he further noted no significant new findings upon his physical examination. He diagnosed relapsing remitting multiple sclerosis and referred Plaintiff for physical therapy. (R. 843.)

Because Plaintiff had moved to Suffolk County, on June 13, 2017 she began treating with neurologist Patricia Coyle, M.D., at Neurology Associates of Stony Brook rather than continuing with Dr. Gottesman. (R. 910.) Plaintiff complained of daily headaches, an itchy sensation, and a need to use a left AFO when leaving the house. (R. 911.) Plaintiff also said that her speech becomes "a little bit imprecise when she's tired" and that "she has pain from her left elbow into her hand," in addition to temperature sensitivity. (Id.) She reported that her headaches and itching sensation were controlled with Gabapentin (Neurontin). (Id.) Plaintiff further reported that she was currently a smoker but was

trying to quit.  (Id.)  Plaintiff also stated that "if 100% is normal she went down to 5% [after her May 28, 2016 onset of MS] and is currently operating at 85-90%."  (Id.)

On physical examination, Dr. Coyle noted Plaintiff's morbid obesity and inability to put her feet together.  (R. 910-12.)  Plaintiff also had difficulty getting up on her heels or toes bilaterally and tandem walking in both directions was "done with great difficulty."  (R. 912.)  Dr. Coyle further observed that although Plaintiff could stand and hop on her right foot, she had difficulty standing on the left foot and an inability to hop on the left foot.  (R. 912.)  Despite these difficulties, Plaintiff had a negative Romberg test.  (Id.)  Although Plaintiff was alert, generally oriented, and able to spell "world" backwards, she was unable to perform mental math and could remember only two of three words after a five-minute delay.  (R. 911.)  Finally, Dr. Coyle noted that she "did not detect any aphasia or dysarthria" and that Plaintiff was "very pleasant" and "very cooperative."  (Id.)

On July 12, 2017, Plaintiff established care with primary care providers at Mather Primary Care.  Plaintiff was seen by Erika Kalabacas, D.O., and reported that she was recently treated for a sinus infection with a Z-Pack but with no relief.  (R. 1019.)  Plaintiff also reported fatigue, back pain and a L3-L4 lumbar disc herniation and sciatica for which she had been seeing a chiropractor but stopped because he was no longer taking

insurance.  (R. 1021.)  Plaintiff reported having back pain but no muscle aches or muscle weakness.  (Id.)  Although Plaintiff further relayed being "very stressed" and that she had "not been eating well", she reported no headaches, depression, or anxiety.  (Id.)  Plaintiff also advised Dr. Kalabacas that while she had quit smoking during her pregnancy, she had since resumed smoking.  (Id.)  Noting her morbid obesity, Dr. Kalabacas also noted that Plaintiff was "ambulating normally" and had a normal gait.  (R. 1021-22.)  The doctor: referred Plaintiff for physical therapy for her back pain; advised Plaintiff to quit smoking and to lose weight; and referred Plaintiff to a dietician.  (R. 1022.)

On July 18, 2017, MRIs of Plaintiff's thoracic spine and cervical spine were normal.  (R. 1095-99, 1240.)  On September 15, 2017, Plaintiff returned to Dr. Coyle's office and consulted with Patricia Melville, N.P. ("Melville"), a neurological specialist in Dr. Coyle's practice.  (R. 1241-43.)  Plaintiff complained of bilateral leg weakness when she "overdoes it."  (R. 1240.)  She reported that she had not stopped smoking, could not attend physical therapy because of childcare, and became tearful during the visit.  (R. 1240-42.)  She further reported feeling anxious and that she planned to see a psychotherapist the following week.  (R. 1240.)

On examination, Plaintiff was seated comfortably and in no acute distress.  (R. 1242.)  Plaintiff: was alert and pleasant;

20

was cooperative and fully oriented; had normal facial strength and sensation; demonstrated a shoulder shrug was within normal limits; and, had clear speech.  (Id.)  While Plaintiff had full strength in her upper extremities, she required some encouragement in her lower bilateral extremities.  (Id.)  She had increased sensation in the left upper and lower extremities.  (Id.)  Plaintiff's finger-to-nose test was intact with no dysmetria present.  (Id.)  Although Plaintiff had an unstable tandem walk, her Romberg test was negative.  (Id.)  Melville's impression of Plaintiff was "relapsing MS;" she continued Plaintiff's prescriptions for physical therapy and Tysabri, adding Zoloft.  (R. 1243.)

During the Fall of 2017, Plaintiff saw her primary care providers on several occasions for various viral and bacterial infections.  Plaintiff was treated at Mather Primary Care on September 26, 2017 for a streptococcal sore throat, and in October 2017 for a sore throat, congestion, cough, acute serous otitis media, laryngitis, and acute sinusitis.  (R. 853-57, 861, 865.) She was also treated at Mather Primary Care in October and November 2017 for mononucleosis, nasal congestion, fever, body aches, and was also referred for nutritional counseling for her morbid obesity.  (R. 853, 896, 950, 1070, 1074-75.)  From September 2017 through April of 2018, Plaintiff was also treated by social worker Katherine Lizama, LCSW, for stress, anxiety, and depression

"related to her issues with multiple sclerosis."  (R. 858, 868, 1067, 1274.)

On January 31, 2018, Dr. Lu diagnosed Plaintiff with "morbid (severe) obesity due to excess calories" and referred her for consultation about revision surgery, having had a gastric bypass surgery in 2008.  (R. 946, 948-50.)  Dr. Lu noted that Plaintiff had "a good functional capacity", that her mood was "normal" and that her mental state was "active and alert."  (R. 987.)  Upon Plaintiff's report of increased anxiety and stress due to her "trouble dealing with MS diagnosis", Dr. Lu noted that as a "single mother [she] feels overwhelmed."  (R. 988.)

In February 2018, Plaintiff presented at Mather Primary Care on two occasions, first with complaints of an upper respiratory infection, and then with abdominal pain.  (R. 1042, 1046.)  An MRI of the brain conducted on February 1, 2018 revealed "unchanged multiple FLAIR hyper-intense white matter lesions involving juxtacortical, periventricular, and deep white matter compatible with a known history demyelination disorder." (R. 1077.)

Plaintiff returned to Melville in March 2018 with complaints of fatigue and reported "several falls in which her left leg 'gave out' while standing." (R. 1254.)  Melville's notes reflect that Plaintiff was "seated comfortably in no acute distress" and was alert, oriented, pleasant, and cooperative.  (R.

1256.)  Plaintiff could recall three out of four words after five minutes, had clear speech, and had "full strength" in her upper and lower extremities.  (Id.)  She had increased sensation, and intact facial strength.  (Id.)  With regard to Plaintiff's gait, Melville noted that her Romberg test was negative and although her "[t]andem is unstable," Plaintiff's timed gait was "9.7 secs x 25ft" with no assistance.  (Id.)  Melville noted, however, that she believed Plaintiff "could have done better with encouragement."  (Id.)

D. Opinion Evidence

On August 30, 2016, Dr. Pollack opined that Plaintiff had "moderate restriction[s] in walking, standing, and climbing stairs", with "mild restriction in bending, lifting, and carrying."  (R. 595.)  Therefore, Plaintiff "should avoid heights, operating heavy machinery, and activities which require heavy exertion, and activities which may put her at risk for fall." (Id.)  On October 26, 2016, Dr. Gottesman opined, that Plaintiff was making a "slow gradual recovery."  (R. 833.)

On January 31, 2018, Dr. Lu opined Plaintiff had "a good functional capacity" and noted that her mood was "normal" and that her mental state was "active and alert."  (R. 985-88.)  Upon Plaintiff's report of increased anxiety and stress due to her "trouble dealing with MS diagnosis", Dr. Lu opined that as a "single mother [she] feels overwhelmed."  (R. 988.)

23

In a letter dated May 8, 2018, Melville stated:

> Please be advised that Ms. Tina Zwiebel is a patient under my care for the treatment of relapsing multiple sclerosis. Relapsing MS is a chronic progressive disease of the CNS characterized by episodes of neurological dysfunction, or relapses. Relapses occur unpredictably and recovery from a relapse may be prolonged or incomplete. There is no cure for MS.
>
> Ms. Zwiebel has intermittent leg weakness, fatigue, cognitive impairment and anxiety as result of her disease. She is currently unable to perform any of her job duties at this time.

(R. 597.)

III. <u>The ALJ's Decision</u>

Initially, in a decision from Administrative Law Judge Theodore Kim dated October 29, 2018 (R. 13-33), the ALJ found that Plaintiff meets the insured-status requirements of her claim through December 31, 2021 (R. 16). Next, the ALJ applied the familiar five-step disability analysis and concluded that Plaintiff was not disabled from May 28, 2016, the alleged disability-onset date, through the date of his decision. (R. 33); <u>see</u> 20 C.F.R. § 404.1520. At steps one through three, the ALJ found that (1) Plaintiff had not engaged in substantial gainful activity since May 28, 2016 (R. 16); (2) Plaintiff had the following severe impairments: clinical obesity, multiple sclerosis, balance disorder, and lumbar disc herniation with sciatica and radiculopathy (R. 16); and (3) these impairments, alone or in combination, did not meet or medically equal the

24

severity of any of the impairments listed in Appendix 1 of the Social Security regulations, 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926 (R. 18-19).

The ALJ next determined Ms. Zwiebel's Residual Functional Capacity ("RFC") as follows:

> . . . claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except the claimant can frequently operate hand controls, reach, push or pull, handle, finger, and feel with both upper extremities. The claimant can occasionally push or pull or operate foot controls with both lower extremities. The claimant can occasionally kneel, crouch, stoop, balance, and crawl, and can occasionally climb stairs and ramps. The claimant can never climb ladders, ropes, and scaffolds, and can never be exposed to unprotected heights and moving mechanical parts. The claimant can never operate a motor vehicle. The claimant can have occasional exposure to dust, mists, gases, noxious odors, fumes, pulmonary irritants, and poor ventilation. The claimant can tolerate occasional exposure to extreme heat, extreme cold, humidity, and vibration. The claimant is able to understand, carry out, and remember simple instructions, and make simple, work-related decisions.

(R. 20.)  At step-four, the ALJ concluded that Ms. Zwiebel is unable to perform any past relevant work as Resident Advisor, Recreation Worker, Resident Care Aide, or a Cashier/Checker. (R. 31.)  However, at step-five, the ALJ concluded that Ms. Zwiebel could perform other jobs in the local and national economy. (R. 32.)  The VE provided a list of three representative occupations including: Dowel Inspector, Eye Glass Frames Polisher, and Final Assembler (Optical). (Id.)  Accordingly, based on his step-five

finding, the ALJ found that Ms. Zwiebel was not disabled as defined by the Social Security Act.  (R. 33.)

DISCUSSION

I.   Standard of Review

In reviewing the ruling of an ALJ, the Court does not determine de novo whether the plaintiff is entitled to disability benefits.  See 42 U.S.C. §§ 405(g), 1383(c)(3).  Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ.  See Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).  If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists.  See Mehnert v. Comm'r of Soc. Sec., No. 19-CV-1054, 2020 WL 6048196, at *2 (W.D.N.Y. Oct. 13, 2020) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).

II.  Analysis

Plaintiff argues that the ALJ did not follow the treating physician rule and failed to give controlling weight Plaintiff's treating physicians.  (See Pl. Br. at 15-19.)  Plaintiff also contends that the ALJ erred by failing to find that Plaintiff's multiple sclerosis met the criteria for medical listing 11.09B by concluding that Plaintiff "suffered no more than mild limitation in mental functioning."  (Pl. Br. at 19-21.)  Finally, Plaintiff

contends that the ALJ failed to properly evaluate her residual functional capacity.  (Pl. Br. at 22-24.)

The Commissioner argues that the ALJ properly found that Plaintiff was not disabled because: (1) the ALJ correctly concluded that Plaintiff's multiple sclerosis did not meet the requirements of Listing 11.09 (Comm'r Br. at 15-17.); and (2) the ALJ's RFC finding is supported by substantial evidence.  (Comm'r Br. at 17-24.)

A.   The ALJ Properly Weighed the Opinion Evidence Under the Treating Physician Rule

The treating physician rule provides that the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight."  Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).  The regulations state:

> Generally, we give more weight to opinions from your treating sources. . . .  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).[5]  Nevertheless, the opinion of a treating physician "need not be given controlling weight where [it

---

[5] "While the Act was amended effective March 27, 2017 [to eliminate the treating physician rule], the Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect."  Williams v. Colvin, No. 16-CV-2293, 2017 WL 3701480, at *1 (E.D.N.Y. Aug. 25, 2017); see also 20 C.F.R.

is] contradicted by other substantial evidence in the record." Molina v. Colvin, No. 13-CV-4701, 2014 WL 3925303, at *2 (S.D.N.Y. Aug. 7, 2014) (internal quotation marks and citation omitted).

When an ALJ does not afford controlling weight to the opinion of a treating physician, he must consider several factors: "(1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist."  Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008).  The ALJ must also set forth "'good reasons' for not crediting the opinion of a plaintiff's treating physician." Id.  "An application of the treating physician rule is sufficient when the ALJ provides 'good reasons' for discounting a treating physician's opinion that reflect in substance the factors as set forth in [Section] 404.1527(d)(2), even though the ALJ declines to examine the factors with explicit reference to the regulation." Crowell v. Comm'r of Soc. Sec., 705 F. App'x 34, 35 (2d Cir. 2017) ("While the ALJ did not explicitly discuss the treating physician rule, he nonetheless stated that [the physician's] opinion . . .

---

§ 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply.  For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

was contradictory to the rest of the record evidence.") (citation omitted).

Here, the ALJ assigned "limited weight" to the opinion evidence from Melville and "some weight" to the opinion evidence from Plaintiff's primary care provider, Dr. Lu, and the consultative examiner, Dr. Pollack,[6] and gave "good reasons" for so doing.  (R. 28-29.)

1. Melville

Initially, the ALJ found that, although Melville had a treating relationship with Plaintiff, Melville's opinion "that the claimant could not return to her job duties" was not supported "with a function-by-function assessment of the claimant's limitations, nor did she include any objective clinical findings, laboratory testing, or imaging results." (R. 28-29.)  In addition, the ALJ determined that Melville's last treatment notes, from March 2018, are inconsistent with her May 2018 opinion that Plaintiff could not perform any of her job duties at that time.  (R. 28, 597.)

The ALJ also found that Melville's opinion was inconsistent with the Plaintiff's testimony regarding her

---

[6] The ALJ also gave "no weight" to the September 28, 2016 physical residual functional capacity assessment completed by a single decision maker ("SDM"), A. Morris, SDM, because "an SDM is not a medical source."  (R. 30, 85-87.)  Neither party challenges this part of the ALJ's decision.

description of activities of daily living, her transition from living with her family to living independently, and her own report of a return of function at 85-90 percent of her former level. (R. 29.)   Further, the ALJ found that Melville's opinion was inconsistent with the clinical findings of Plaintiff's neurologists, physical therapists, and primary care physicians. (Id.)

Plaintiff contends that the ALJ erred by "discard[ing] [Melville's] [ ] opinion completely" because Melville did not support her opinion with a function-by-function assessment of Plaintiff's limitations, nor did she include any objective clinical findings, laboratory testing, or imaging results.  (Pl. Br. at 17.)  Rather, Plaintiff asserts that the ALJ "should have requested further clarification of those opinions" from Melville and his failure to do so requires remand. (Pl. Br. at 17.)  The Commissioner argues that "the ALJ was under no obligation to recontact NP Melville for clarification of her opinion" and cites the revised regulations (20 C.F.R. §§ 404.1512, 404.1527) which permit, but do not require, an ALJ to obtain additional information or clarification. (Comm'r Br. at 20.)   The Court agrees.

As a threshold matter, contrary to Plaintiff's assertion, the ALJ did not discount Melville's opinion completely. Rather, the ALJ assigned it limited weight and gave good reasons for so doing. (See supra at 29-30.)  Moreover, as the record in

30

this case makes clear, the ALJ had a complete medical history for Plaintiff at the time his decision was rendered.  Thus, to the extent Plaintiff argues the ALJ should have sought clarification from Melville for her opinion, such position is a nonstarter.  It is well-established that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history', the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 75 n.5 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)); see also Yucekus v. Comm'r of Soc. Sec., 18-CV-3436, 2020 WL 5988526, at *3 (2d Cir. Oct. 9, 2020) (citing Rosa and rejecting argument that ALJ failed to fulfill her duty to develop the medical record where there were no "clear gaps in the administrative record.").  Melville's own treatment notes undoubtedly reflect that Plaintiff's symptoms had improved.  (R. 1256.)  Melville also noted that Plaintiff was in no acute distress and was alert, oriented, pleasant, and cooperative.  (Id.)  Plaintiff had clear speech and had "full strength" in her upper and lower extremities as well as increased sensation, and intact facial strength.  (Id.)  Thus, the ALJ gave good reasons for assigning Melville's opinion limited weight.

    2. Dr. Lu

       With regard to the ALJ's assignment of "some weight" to Dr. Lu's January 2018 assessment that Plaintiff has "a good

functional capacity", the Court similarly finds that the ALJ gave good reasons for that assignment.[7]   The ALJ found that Dr. Lu's "opinion is well-supported by and consistent with his contemporaneous medical records, which stated that the claimant was healthy-appearing, in no acute distress, and had normal psychiatric, cardiovascular and musculoskeletal findings."   (R. 29.)   The ALJ further found that Dr. Lu's opinion was "consistent with the preponderance of the medical evidence, which establishes that the claimant can ambulate without assistive devices, has full strength in the upper and lower extremities, and at least four out of five strength in the left upper extremity." (R. 29.)   Moreover, Dr. Lu's opinion was found to align with the "claimant's relatively conservative and routine treatment history, her activities of daily living, and her transition from living with her family to living independently." (R. 29.)   However, because Dr. Lu did not address any of Plaintiff's specific work-related functions or any limitations she may have, the ALJ properly assigned this opinion some weight.  Cottrell v. Comm'r of Soc. Sec., 17-CV-6893, 2019 WL 201508, at *3 (W.D.N.Y. Jan. 15, 2019) ("[B]ecause the ALJ relied on those [medical] opinions and other record evidence to determine

---

[7] The Court notes that Plaintiff makes no specific arguments with regard to the ALJ's assignment of weight to Dr. Lu's opinion. Notably, had the ALJ assigned Dr. Lu's opinion controlling weight, it would only bolster his conclusion that Plaintiff was not disabled.

[Plaintiff]'s RFC, she was not required to perform a function-by-function assessment.") (citing <u>Guttierez v. Berryhill</u>, 333 F. Supp. 3d 267, 272 (W.D.N.Y. 2018) ("When an ALJ does <u>not</u> rely on a medical opinion to formulate the RFC, she must provide a function-by-function analysis of [the claimant]'s work-related capacity." (quotation marks and citation omitted)(emphasis added)).

### 3. Dr. Pollack

Similarly, the ALJ gave good reasons for his assignment of "some weight" to the August 2016 opinion of Dr. Pollack. (R. 29-30.) Dr. Pollack opined that Plaintiff had a "moderate restriction in walking, standing, and climbing stairs and a mild restriction in bending, lifting, and carrying." (R. 29.) The doctor also opined that Plaintiff "should avoid heights, operating heavy machinery, and activities that require heavy exertion or that put [her] at risk for fall." (<u>Id.</u>) The ALJ gave these opinions some weight because they were supported by Dr. Pollack's own examination report of Plaintiff as well as Plaintiff's report of her daily activities as recorded by Dr. Pollack. (<u>Id.</u>) Further, the ALJ found that Dr. Pollack's opinion was "consistent with the preponderance of the medical findings documented in the record" and "is consistent with the physical examination findings showing the claimant can ambulate without assistive devices, has full strength in the upper and lower extremities, and at least

four out of five strength in the left upper extremity." (R. 29-30.) However, because Dr. Pollack's opinion was "somewhat vague because he did not use vocationally relevant terms in assessing the claimant's specific limitations," the ALJ properly assigned "some, but not significant weight" to his opinion. (R. 30.)

Plaintiff contends that the ALJ's failure to include Dr. Pollack's clinical finding regarding Plaintiff's inability to heel-toe walk in the decision was error because 20 C.F.R. § 404.1527 requires that the weight given a medical opinion be explained. Although an inability to heel-toe walk is cited in the Medical Listing of Impairments as evidence of significant motor loss, Plaintiff's contention misses the mark because the ALJ provided sufficient reasons for his assignment of weight to Dr. Pollack's opinion. While a consulting physician's opinions should generally be afforded limited weight, "as part of [the] review of the evidence before him, an ALJ has the discretion to grant various degrees of weight to the opinion of such practitioners, which may be greater than the weight awarded to a claimant's treating physician." Heitz v. Comm'r of Soc. Sec., 201 F. Supp. 3d 413, 422 (S.D.N.Y. 2016) (citations omitted).

The ALJ specifically referenced the second, third, fourth, and fifth factors (the nature and extent of the treatment relationship, extent to which the opinion is supported by medical and laboratory findings, physician's consistency with the record

as a whole, and whether the physician is a specialist) with respect to Dr. Pollack's opinion.  (R. 29-30.)  Moreover, the ALJ cited Dr. Pollack's examination report, which documents difficulties in the claimant's ambulation and a left foot drop.  (R. 29.)  The ALJ further found that Dr. Pollack's opinion was consistent with Plaintiff's relatively conservative and routine treatment history. (R. 30.)  Although the ALJ did not necessarily recount the factors (see 20 C.F.R. § 416.927(c)) in assigning "some weight" to Dr. Pollack's opinions, the Second Circuit has made clear that the ALJ need not produce a "slavish recitation of each and every factor [set forth in 20 C.F.R. § 404.1527(c)] where the ALJ's reasoning and adherence to the regulation are clear."  See Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013); see also Khan v. Astrue, No. 11-CV-5118, 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013). Rather, the ALJ need only apply "the substance of the treating physician rule."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam) (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed").  The Court thus concludes that the ALJ adequately explained the factors he considered in assigning some weight to Dr. Pollack's opinion.

B.   The ALJ Properly Found that Plaintiff's Multiple
     Sclerosis Did Not Meet the Criteria for Medical
     Listing 11.09B, Concluding that Plaintiff Suffered
     Only Mild Limitations

Where an alleged impairment is based on multiple sclerosis, it is considered to be "listed" as a qualifying impairment at step three if it satisfies one of three alternative sets of criteria. 20 C.F.R. Pt. 404, Subpart P, App'x 1, § 11.09. As is relevant here, the "paragraph B" criteria states that multiple sclerosis must result in mental impairment as described under the criteria in 20 C.F.R. Pt. 404, Subpart P, App'x 1, § 11.09B; see Bracken v. Colvin, No. 16-CV-6488, 2017 WL 5999952, *10 (S.D.N.Y. Sept. 19, 2017). More specifically, § 11.09B is satisfied where there is a marked limitation in physical functioning and in one of the following: (1) understanding, remembering, or applying information; or (2) interacting with others; or (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. 20 C.F.R. Part 404, Subpart P., App'x 1, § 11.09B. "To meet these requirements, a claimant 'must offer medical findings equal in severity to all requirements, which must be supported by medically acceptable clinical and laboratory diagnostic techniques.'" Debra E. v. Comm'r of Soc. Sec., No. 18-CV-0513, 2019 WL 4233162, at *7 (N.D.N.Y. Sept. 6, 2019). The claimant bears the burden of establishing that her impairment matches, or is equal in severity to, a Listing. Naegele v.

36

Barnhart, 433 F. Supp. 2d 319, 324 (W.D.N.Y. 2006) ("It must be remembered that plaintiff has the burden of proof at step 3 that she meets the Listing requirements.").

Plaintiff argues that the ALJ erred because the medical evidence substantiates a marked limitation in both physical and mental functioning. (Pl. Br. at 19-21.) The Commissioner argues that neither prong of § 11.09B is satisfied. (Comm'r Br. at 15-17.) For the reasons that follow, the Court is satisfied that there is substantial evidence in the record that supports the ALJ's determination.

In concluding that Plaintiff did not have a marked limitation in physical functioning, the ALJ relied upon, inter alia, Plaintiff's primary care providers' findings, as well as Plaintiff's own assessment that she had recovered to 85-90 percent of her prior level of physical functioning. (R. 19.) The ALJ also noted that Plaintiff did not use her assistive devices even though she had been prescribed a wheelchair and cane. (Id.) Thus, the ALJ found that the severity of Plaintiff's physical impairments, considered singly and in combination, do not meet or medically equal the listing criteria. (Id.) However, even if the ALJ had found a marked limitation in physical functioning, his decision would still be supported by substantial evidence because Plaintiff did not have more than a mild limitation in mental functioning for the reasons that follow.

The ALJ carefully reviewed each area of mental functioning in reaching his conclusion that "[t]he severity of claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.06." (R. 17.)   Rather, the ALJ found that any limitation Plaintiff has in her mental function is mild. (R. 17-18.) First, with regard to "understanding, remembering, or applying information," the ALJ found Plaintiff had only a mild limitation. (R. 17.)  In reaching this conclusion, the ALJ relied on the ample evidence regarding Plaintiff's cognitive abilities in this regard, including her ability to manage money and follow written and spoken instructions. (Id.)  While noting that the record was inconsistent with Plaintiff's hearing testimony that she has trouble with her memory, concentrating, and thinking, the ALJ found Plaintiff has "no more than mild limitation in this domain." (R. 17.)  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

Similarly, regarding the functional area of "interacting with others," the ALJ cited Plaintiff's own report of socializing with friends, together with the frequent description of

38

Plaintiff's demeanor in the record as "cooperative" and "pleasant". (R. 17.) The ALJ also noted the absence of any evidence that Plaintiff has a history of losing a job because of difficulty interacting with people and no evidence of Plaintiff's difficulty relating to or interacting with medical professionals. (Id.) As to the third functional area, "concentrating, persisting, or maintaining pace," the ALJ cited to evidence in the record demonstrating Plaintiff's ability to drive, prepare meals, complete household chores together with Plaintiff's report that she "finishes what she starts." (Id.) Further, the ALJ found no more than a mild limitation in Plaintiff's ability to adapt or manage herself. (R. 18.) With regard to the fourth functional area "adapting or managing oneself," the ALJ noted Plaintiff's anxiety, but further stated Plaintiff has a "fairly independent lifestyle," highlighting Plaintiff's move from living with family members to living alone with her infant daughter, to conclude that Plaintiff's limitation in this regard was mild. (R. 17.)

Plaintiff's argument that she satisfies the § 11.09B medical listing for mental impairment relies solely on Plaintiff's own testimony. (Pl. Br. at 21.) However, the ALJ concluded that Plaintiff's testimony was "not entirely consistent with the medical evidence and other evidence in the record." (R. 21.) It is long established that "'the ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment,

in light of medical findings and other evidence.'" Mollo v. Barnhart, 305 F. Supp. 2d 252, 263-64 (E.D.N.Y. 2004) (quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)); see also Fiumano v. Colvin, No. 13-CV-2848, 2013 WL 5937002, at *9 (E.D.N.Y. Nov. 4, 2013) ("An ALJ is not required to accept a claimant's testimony regarding the severity and persistence of [her] symptoms as true, but rather can evaluate the credibility of a claimant to arrive at an independent judgment based on the medical findings and other evidence"). The ALJ noted that the contemporaneous reports indicated Plaintiff was alert and oriented, her treating physician never indicated a need for cognitive testing, and that Plaintiff engaged in a full range of activities of daily living. Accordingly, the ALJ's determination that Plaintiff did not meet the "paragraph B" criteria of § 11.09 was not in error.

C.   The ALJ Properly Evaluated Plaintiff's RFC

The ALJ determined that Plaintiff has the RFC to perform sedentary work. (R. 20.) Plaintiff contends that the ALJ erred by "substitut[ing] his lay interpretation of the medical evidence for competent medical opinion." (Pl. Br. at 22.) Further, Plaintiff asserts that the ALJ failed to assess Plaintiff's "ability to perform work activities on a function-by-function basis before finding [her] capable of performing sedentary work." (Pl. Br. at 22.) Finally, Plaintiff argues that the ALJ did not address Plaintiff's absenteeism or time off in formulating the

RFC. (Pl. Br. at 24.)    The Commissioner argues that the RFC determination is supported by substantial evidence.  (Comm'r Br. at 17-24.)

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four. At Step Five, the burden shifts to the Commissioner to show there is other work that the claimant can perform." McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014) (internal quotation marks and citation omitted).  The ALJ based his RFC conclusion upon opinions he gave "some" or "limited" weight.  (R. 28-30.)  However, he thoroughly recounted the treatment records, examination results, and clinical findings. (R. 20-30.)  "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order).

Plaintiff's contention that the ALJ substituted his lay interpretation of the medical evidence for competent medical opinion or failed to assess Plaintiff's ability to perform work activities on a function-by-function basis before finding her capable of performing sedentary work is belied by the record. Wholly absent from the record is any support for Plaintiff's bald

assertion that the ALJ relied on his lay interpretation of the
medical evidence.   Rather, the ALJ expressly and repeatedly
referenced "the entire record," "the medical evidence," "all the
evidence," and "the objective medical evidence or record" in
reaching his RCF determination.   (R. 19-21, 26-27.)   In addition
to the "objective medical evidence", the ALJ also considered
Plaintiff's "activities of daily living" and concluded that such
activities demonstrate a "higher level of functioning" than
Plaintiff alleged.   (R. 28.)   Specifically, the ALJ determined
that the fact that Plaintiff lived alone with her infant daughter,
coupled with Plaintiff's own testimony that she "could sweep, mop,
wash dishes, manage her personal care and grooming, and shop for
a few small items at the grocery store" contradicted the
limitations Plaintiff claimed.   (Id.)   Further, the ALJ
acknowledged that Plaintiff reported fatigue after performing
activities and, on occasion required assistance from her sister.
(Id.)  However, the ALJ also noted that "[t]reating providers have
not recommended that the claimant live at a full-time care facility
or otherwise have a caretaker.   In fact, treatment records show
that the claimant was living with family and has since transitioned
to living alone, which is consistent with the improvement in the
claimant's overall functioning demonstrated in the remainder of
the record."  (Id.)

Plaintiff also claims the ALJ erred by failing to assess her ability "to perform work activities on a function-by-function basis before finding [her] capable of performing sedentary work." (Pl. Br. at 22.)  However, Plaintiff ignores that the ALJ expressly referenced 20 C.F.R. §§ 404.1567(a) and 416.967(a) which define the exertional requirements for sedentary work.  (R. 20.)  Indeed, the ALJ then cited to SSR 96-8p and explained that Plaintiff's RFC was determined "based on all of the evidence with consideration of the limitations and restrictions imposed by the combined effects of all of the claimant's medically determinable impairments." (Id.)

As the evidence in the record makes clear, Plaintiff had full strength throughout her upper and lower extremities, did not use the prescribed assistive devices including a wheelchair and cane, and generally ambulated normally with the use of the left AFO.[8]  (R. 594-95, 605, 670, 787, 1167-68, 1242, 1256.)  Further, the record demonstrates that Plaintiff had near to full strength in all extremities and intact hand and finger dexterity, as well

_____

[8] In assessing Plaintiff's RFC, the ALJ properly considered Plaintiff's improvement and effective management of her symptoms.  See, e.g., Matta, 508 F. App'x at 57 ("[S]ubstantial evidence in the record supports the ALJ's conclusion that this plaintiff, with the proper treatment, could perform work on a regular and continuing basis."); Alston v. Sullivan, 904 F.2d 122, 127 (2d Cir. 1990) (considering the fact that a claimant's conditions were controlled with medication in support of an ALJ's determination that the claimant was not disabled).

as full grip strength bilaterally.   (R. 585, 594-95, 834, 837, 1167-68, 1256.)  Given this evidence, the ALJ found that Plaintiff can perform sedentary work with frequent handling, fingering, pushing, pulling, and reaching, in addition to occasional pushing, pulling, kneeling, crouching, stooping, balancing, crawling, or operating foot controls with both lower extremities.   (R. 20.) Thus, the ALJ's RFC finding does include a function-by-function analysis of Plaintiff's ability to perform sedentary work. Corbiere v. Berryhill, 760 F. App'x 54, 56-57 (2d Cir. 2019) (ALJ's finding that claimant could perform sedentary work upheld where the evidence in the record supported that RCF); Matta, 508 F. App'x at 56 (ALJ properly weighed all of the evidence in the record to make an RFC finding that was consistent with the record as a whole even though the RFC finding did not "perfectly correspond" with any of the medical sources cited).

Finally, Plaintiff contends that the ALJ did not take her absenteeism or "being off task" into consideration in formulating the RFC.  (Pl. Br. at 24.)  The Court disagrees.  As the ALJ's decision makes clear, he did not credit Plaintiff's testimony concerning the frequency and severity of her symptoms. (R. 21.)  While the ALJ expressly recalled Plaintiff's testimony that she "gets sick frequently from viral infections" and that "it takes at least five days for her to get better" (id.), the record evidence further made clear that Plaintiff's viral and bacterial

44

infections were confined to the time period beginning in July 2017 and ending in February 2018. (R. 853-57, 861, 865, 896, 950, 1019, 1042-46, 1070, 1074-75.) Moreover, the ALJ accommodated Plaintiff's claimed "chronic" viral infections by including restrictions from pulmonary irritants in the RFC. (R. 20, 30, 48.)

The Second Circuit has "defined 'substantial evidence' as more than a 'mere scintilla,' and as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Barry v. Colvin, 606 F. App'x 621, 622 (2d Cir. 2015) (quoting Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)). "'When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" Yucekus, 2020 WL 5988526, at *1 (quoting Genier, 606 F.3d at 49); Skibniewski v. Comm'r of Soc. Sec., No. 19-CV-00506, 2020 WL 5425343, at *5 (W.D.N.Y. Sept. 10, 2020) ("It is within an ALJ's discretion to compare and contrast the various medical opinions, along with all other relevant evidence, to resolve the conflicts in the evidence and determine Plaintiff's RFC.") (quoting Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)).

Here, the Court finds that the ALJ adequately considered the documentary evidence, treatment notes, and Plaintiff's own testimony regarding her limitations. See Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8–9 (2d Cir. 2017) ("Because the ALJ reached her RFC determination based on [the treating physician's] contemporaneous treatment notes . . . that determination was adequately supported by more than a mere scintilla of evidence."); Matta, 508 F. App'x at 56 ("As the ALJ explained in his opinion, his RFC assessment took account of the opinions of all of these experts and the notes of other treatment providers"); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112–13 (2d Cir. 2010) ("[A]lthough the ALJ might have been more specific in detailing the reasons for concluding that plaintiff's condition did not satisfy a listed impairment, other portions of the ALJ's detailed decision, along with plaintiff's own testimony, demonstrate that substantial evidence supports this part of the ALJ's determination."). Taking into account Plaintiff's history of treatment, range of daily activities and the objective findings in the record, the ALJ concluded Plaintiff could perform sedentary work. (R. 20.) Considering the entirety of the record, the Court finds that the ALJ's RFC determination that Plaintiff could perform "sedentary" work, with limitations, is consistent with the objective medical evidence, the claimant's activities of daily

living, and the opinion evidence as weighed by the ALJ.  As such, substantial evidence supports the RFC finding.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion (D.E. 16) is DENIED and the Commissioner's motion (D.E. 17) is GRANTED.

The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


**SO ORDERED.**

*/s/ Joanna Seybert*
JOANNA SEYBERT, U.S.D.J.

Dated:      November 17, 2020
            Central Islip, New York

47